DAVID L. NEALE (SBN 141225)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dln@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>North American Health Care, Inc.,<br><br>     Debtor and Debtor in Possession.<br>_____ | ) Lead Case No.: 8:15-bk-10610-MW<br>)<br>)<br>)<br>)<br>)<br>) Jointly administered with:<br>) |
| In re:<br><br>Carmichael Care, Inc.,<br><br>     Debtor and Debtor in Possession.<br>_____ | ) Case No. 8:15-bk-10612-MW<br>)<br>) Chapter 11 Cases<br>)<br>) **DEBTORS' EMERGENCY MOTION**<br>) **FOR AN INTERIM ORDER**<br>) **AUTHORIZING THE DEBTORS TO**<br>) **USE CASH COLLATERAL ON AN**<br>) **INTERIM BASIS PENDING A FINAL**<br>) **HEARING; MEMORANDUM OF**<br>) **POINTS AND AUTHORITIES** |
| ☒  Affects All Debtors<br><br>☐ Affects North American Health Care, Inc.<br>☐ Affects Carmichael Care, Inc. | )<br>)<br>) Date:   TBD<br>) Time:   TBD<br>) Place:  Courtroom "6C"<br>)             411 W. Fourth Street<br>)             Santa Ana, CA 92701<br>)<br>)<br>) **[Omnibus Declaration of Spencer Olsen,**<br>) **and Declaration of Krikor J. Meshefejian**<br>) **filed concurrently herewith]**<br>)<br>)<br>)<br>_____ ) |

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2, and 9075-1, and 11 U.S.C. §363, North American Health Care, Inc. ("NAHC"), and Carmichael Care, Inc. ("CCI" and collectively with NAHC, the "Debtors"), the chapter 11 debtors and debtors in possession in the jointly administered chapter 11 bankruptcy cases captioned above, hereby move, on an emergency basis, for an order authorizing the Debtors to use their respective cash collateral on an interim basis pending a final hearing (the "Motion").

On February 6, 2015, NAHC and CCI each filed voluntary petitions under Chapter 11 of the Bankruptcy Code. Since the commencement of their cases, the Debtors have been operating their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

CCI is the operator of a skilled nursing facility known as Rosewood Post-Acute Rehabilitation (the "Rosewood Facility"). The Rosewood Facility is licensed by the California Department of Public Health. NAHC provides services to CCI pursuant to a Services Agreement between NAHC and CCI. Specifically, pursuant to the Services Agreement, NAHC provides non-licensed personnel to CCI as necessary for the business of the Rosewood Facility. For example, NAHC provides to the Rosewood Facility bookkeeping and accounting services, public relations and social media services, supply procurement services, record storage services, payroll services, insurance procurement services, information technology services, human resource services, and other peer review support services.

NAHC provides essential services to 36 facilities, including the Rosewood Facility. NAHC is a highly experienced provider of services to skilled nursing facilities, and its principal place of business is in Dana Point, California.

The Rosewood Facility provides 24 hour, 7 days a week and 365 days a year care to patients who reside at the Rosewood Facility. The Rosewood Facility currently has approximately 107 patients, and is staffed by approximately 184 employees. The Rosewood Facility has 112 beds. NAHC charges CCI service fees in connection with the services NAHC provides to the Rosewood Facility.

NAHC and CCI are owned by the same investors. Specifically, NAHC is owned 44% by

Vermillion Investment Co. LLC, 24% by Davey Jay LLC, 28% by Oakleaf Holding, LLC, 2% by Shard Holding, LLC, and 2% by Jay Kevin Laws.[1]  CCI's ownership structure is identical to NAHC's ownership structure. Both entities also have the same individuals serving on each of their Boards of Directors.

CCI is profitable, and cash-flow positive. NAHC is not profitable, yet is cash-flow positive.  However, the Debtor's bankruptcy filings were necessitated by the barrage of alleged medical malpractice and other lawsuits filed against the Debtors, claiming damages in the millions of dollars against the Debtors, and the aggressive litigation tactics of the plaintiffs in these lawsuits that have diverted the Debtors' resources and focus away from operating their businesses.  The Debtors deny any liability with respect to these lawsuits.  The Rosewood Facility has been operated according to exacting standards and the highest level of patient care.  Indeed, the Rosewood Facility continues to provide respected, Five-Star (as rated by CMS) care for its patients.

Despite this record of achievement, certain plaintiffs' counsel have targeted the Debtors and have relentlessly pursued what they perceive to be potential "deep pockets" for recovery. However, had the Debtors not filed for bankruptcy protection, and had plaintiffs with disputed claims continued their unending litigation attacks against the Debtor, or obtained their threatened judgments, the inevitable result would have been that the Debtors would have been forced to close their businesses.  The Debtors, after substantial consideration of possible alternatives, substantial efforts to settle disputes and litigation claims, and careful consideration of the effect of the bankruptcy filings on their businesses, determined that the most prudent, proactive and responsible course of action in order to protect their assets and the interests of their creditors, was to file for bankruptcy protection.  The Debtors intend to work to reorganize their financial affairs

---

[1]  Spencer Olsen and Verla Sorensen are the managers of Vermillion Investment Co. LLC (and Spencer Olsen is also the Chief Financial Officer and Treasurer of only CCI, and also an assistant secretary and a Director of both CCI and NAHC).  Don Laws is the manager of Davey Jay LLC. John L. Sorensen is the Trustee of the Manager of Oakleaf Holding, LLC (and Mr. Sorensen is also the President and Chief Executive Officer of NAHC, and the Chairman of the Board of Directors of CCI).  Additional information regarding the officers and directors of the Debtors will be provided when the Debtors file their Schedules of Assets and Liabilities and Statements of Financial Affairs.

and resolve their litigation in a cohesive, organized manner, in a single forum.

In order to continue operations and preserve the going-concern value of their businesses, the Debtors require a bankruptcy court order authorizing the use of cash collateral. The Debtors do not believe that any party asserting a security interest in either of the Debtors' respective assets will oppose this Motion. The Debtors' secured debt, if any, is not substantial.

The following parties have filed UCC-1 financing statements against NAHC, some of which assert an interest in NAHC's cash, as follows:

1.      First Professional Bank N.A. ("FPB"):  FPB asserts a security interest in nearly all of NAHC's assets, including NAHC's cash.  NAHC does not concede that FPB has a security interest in NAHC's cash collateral.  As of the Petition Date, NAHC owed FPB the sum of $0. FPB appears to be the predecessor to Pacific Western National Bank.

2.      American Express Business Finance Corporation ("AMEX"):  AMEX asserts a security interest in all of NAHC's assets, including accounts, in connection with what appears to be an equipment lease between AMEX and NAHC (NAHC does not take any position at this time whether the agreement is a true lease).  NAHC does not concede that AMEX has a security interest in NAHC's cash collateral.  As of the Petition Date, NAHC owed AMEX the sum of $3,496.24.

3.      Telerent Leasing Corporation ("Telerent"):  Telerent asserts a security interest in certain equipment.  It does not appear that Telerent asserts a security interest in NAHC's cash. As of the Petition Date, NAHC owed Telerent the sum of $0.

The following parties have filed UCC-1 financing statements against CCI, some of which assert an interest in CCI's cash, as follows:

1.      First Professional Bank N.A. (FPB):  FPB asserts a security interest in nearly all of CCI's assets, including CCI's cash.  CCI does not concede that FPB has a security interest in CCI's cash collateral.  As of the Petition Date, CCI owed FPB the sum of $0.  FPB appears to be the predecessor to Pacific Western National Bank.

2.      Pacific Western National Bank ("PWB"): PWB asserts a security interest in nearly all of CCI's assets, including CCI's cash.  CCI does not concede that PWB has a security interest

1  in CCI's cash collateral.  As of the Petition Date, CCI owed PWB the sum of approximately

2  $79,000, in connection with a business loan originally made to CCI in 4/7/12, in the original

3  principal amount of $232,906.  CCI is current with all of its loan obligations to PWB.  CCI

4  intends to remain current on its obligations to PWB during the course of these Chapter 11

5  bankruptcy cases.

6      3.    GreatAmerica Leasing Corporation ("GreatAmerica"): GreatAmerica asserts a

7  security interest in certain equipment.  It does not appear that GreatAmerica asserts a security

8  interest in CCI's cash. As of the Petition Date, CCI owed GreatAmerica the sum of $0.

9      Filed concurrently herewith is the Declaration of Krikor J. Meshefejian which attaches as

10  Exhibits the above-referenced UCC-1 financing statements.

11      As of the Petition Date, NAHC had cash on hand of approximately $1,902,388 and CCI

12  had cash on hand in the approximate amount of $1,023,049.   In total, the Debtors had cash on

13  hand of approximately $2,925,437 as of the Petition Date.  NAHC's primary assets consist of its

14  service agreements with the 36 facilities, including CCI, its cash on hand, its receivables in the

15  amount of approximately $1,297,629, its lease of real property located at 32836 Pacific Coast

16  Highway, Dana Point, CA  92629, and fixed assets with a book value of approximately $222,495.

17      CCI's primary assets consist of its accounts receivable (owing by Medi-Cal, Medicare,

18  and private pay patients), its lease of real property located at 6041 Fair Oaks, Blvd, Carmichael,

19  CA  95608, the Rosewood Facility itself (i.e., CCI's business of operating a skilled nursing

20  facility), and the personal property assets located at the Rosewood Facility.  As of the Petition

21  Date, CCI had outstanding accounts receivable of approximately $1,944,387.

22  **The proposed operating budget for NAHC is attached as Exhibit 1 to the Omnibus**

23  **Declaration of Spencer Olsen.**

24  **The proposed operating budget for CCI is attached as Exhibit 2 to the Omnibus**

25  **Declaration of Spencer Olsen.**

26      As these budgets respectively show, in addition to the respective cash on hand as of the

27  Petition Date and accounts receivable of the Debtors outstanding as of the Petition Date, NAHC

28  expects to collect just during the remaining portion of February 2015 and the month of March

2015, the amount of approximately $4,100,000, and CCI expects to collect during that same period of time, the amount of approximately $2,000,292.

Based on the foregoing, the Debtors submit that their respective cash on hand and accounts receivable provide such claimants (to the extent that they have an interest in the Debtors' respective cash) with substantial equity cushions. As a result, there cannot be any question that these claimants are adequately protected by an overwhelming equity cushion and cannot be harmed in any way by the Debtors' use of their respective cash collateral.

The Debtors require an immediate order of this Court authorizing these Debtors to use cash collateral in accordance with their respective budgets to enable these Debtors to (i) pay all of their normal and ordinary operating expenses (such as payroll, rent, utilities, insurance, and payments to vendors for, in the case of the Rosewood Facility, service fees to NAHC, patient food and medical supplies and services such as therapy and lab) as they come due in the ordinary course of their businesses; (ii) purchase new inventory in order for these Debtors to preserve the going concern value of their businesses, assets and reorganization efforts; and (iii)  avoid immediate and irreparable harm.

It is clear that the Debtors' businesses have significant going concern value and the cessation of the Debtors' business operations would place that going concern value in serious jeopardy, as well as cause the loss of the jobs of the Debtors' employees and displacement of and risk to the health and well-being of the current residents of the Rosewood Facility.

The Debtors therefore seek authority to use cash collateral on an interim emergency basis pending a final hearing in accordance with their budgets, except that these Debtors seek Court authority to exceed the total budgeted sums (on an aggregate basis with these Debtors having the ability to deviate on particular line items by more than 25% provided the aggregate deviation does not exceed 25%) in any single month. If actual expenditures for any line items are less than the budgets, the difference shall carryover to the following month. The continued residency and care for all of the current patients of the Rosewood Facility and the continued employment of all of the Debtors' respective current employees are entirely dependent upon these Debtors' immediate use of cash collateral. Given the devastating impact that a closure of these Debtors' businesses would

have on employees, residents and creditors, and given the overwhelming value in these businesses, these Debtors submit that immediate use of cash collateral is clearly warranted and appropriate.

### ADDITIONAL INFORMATION

Pursuant to Local Bankruptcy Rule 4001-2, the Debtors submit that their proposed order authorizing these Debtors' use of cash collateral on an interim basis pending a final hearing will not contain the following provisions:

| Provision | Cash Collateral Order |
|---|---|
| A provision that provides cross-collateralization protection to any secured creditor (i.e., a clause that would secure the creditor's pre-petition claims by post-petition assets that the creditor does not otherwise have a security interest in by virtue of its pre-petition loan agreements or applicable law) | No |
| A provision or finding of fact that binds the estate or parties in interest with respect to the validity, perfection or amount of a creditor's pre-petition liens or claims or the waiver of claims against the creditor | No |
| A provision that waives the estate's rights under 11 U.S.C. § 506(c) | No |
| A provision that grants to the creditor liens upon the avoidance actions | No |
| A provision that deems the creditor's pre-petition claims to be post-petition claims | No |
| A provision regarding the extension of any post-petition loans or financial accommodations from the creditor or any third party to the Debtor | No |
| Any disparate treatment of the professionals retained by a creditors' committee from that provided to the professionals retained by the Debtor with respect to a professional fee carve out. | No |
| Primes any secured lien | No |

The relief sought in the Motion is based upon the Motion, the annexed Memorandum of Points and Authorities, the Omnibus Declaration of Spencer Olsen filed concurrently herewith, the Declaration of Krikor J. Meshefejian filed concurrently herewith, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

The Debtors will serve this Motion on their secured creditors, alleged lienholders, their twenty largest unsecured creditors (respectively) and the United States Trustee via overnight mail,

no later than February 12, 2015, such that these parties will receive this Motion no later than February 13, 2015.

WHEREFORE, the Debtors respectfully request that this Court hold a hearing on this Motion, and enter an order substantially in the form attached as Exhibit "4" to the Declaration of Krikor J. Meshefejian:

(a)     authorizing these Debtors to use the cash collateral on an emergency interim basis pending a final hearing pursuant to the terms and conditions set forth in the Motion;

(b)     setting a final hearing to consider the Motion; and

(c)     granting such other and further relief as the Court deems just and proper.

Dated:  February 11, 2015               NORTH AMERICAN HEALTH CARE, INC.;
                                        CARMICHAEL CARE, INC.

                                        By:   /s/ Krikor J. Meshefejian
                                              David L. Neale
                                              Krikor J. Meshefejian
                                              Levene, Neale, Bender, Yoo & Brill L.L.P.
                                              Proposed Attorneys for Debtors and Debtors
                                              in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  STATEMENT OF FACTS

**A.**   **Background Information Regarding The Debtors, Their Businesses, And Reasons For Filing Bankruptcy.**

On February 6, 2015, NAHC and CCI each filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  Since the commencement of their cases, the Debtors have been operating their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

CCI is the operator of a skilled nursing facility known as Rosewood Post-Acute Rehabilitation (the "Rosewood Facility").  The Rosewood Facility is licensed by the California Department of Public Health.  NAHC provides services to CCI pursuant to a Services Agreement between NAHC and CCI.  Specifically, pursuant to the Services Agreement, NAHC provides non-licensed personnel to CCI as necessary for the business of the Rosewood Facility.  For example, NAHC provides to the Rosewood Facility bookkeeping and accounting services, public relations and social media services, supply procurement services, record storage services, payroll services, insurance procurement services, information technology services, human resource services, and other peer review support services.

NAHC provides essential services to 36 facilities, including the Rosewood Facility.  NAHC is a highly experienced provider of services to skilled nursing facilities, and its principal place of business is in Dana Point, California.

The Rosewood Facility provides 24 hour, 7 days a week and 365 days a year care to patients who reside at the Rosewood Facility.  The Rosewood Facility currently has approximately 107 patients, and is staffed by approximately 184 employees.  The Rosewood Facility has 112 beds.  NAHC charges CCI service fees in connection with the services NAHC provides to the Rosewood Facility.

NAHC and CCI are owned by the same investors.  Specifically, NAHC is owned 44% by Vermillion Investment Co. LLC, 24% by Davey Jay LLC, 28% by Oakleaf Holding, LLC, 2% by

1    Shard Holding, LLC, and 2% by Jay Kevin Laws.[2]  CCI's ownership structure is identical to

2    NAHC's ownership structure. Both entities also have the same individuals serving on each of

3    their Boards of Directors.

4            The Debtors are cash-flow positive and CCI is profitable but the Debtors' bankruptcy

5    filings were necessitated by the barrage of alleged medical malpractice and other lawsuits filed

6    against the Debtors, claiming damages in the millions of dollars against the Debtors, and the

7    aggressive litigation tactics of the plaintiffs in these lawsuits that have diverted the Debtors'

8    resources and focus away from operating their businesses.  The Debtors deny any liability with

9    respect to these lawsuits.  The Rosewood Facility has been operated according to exacting

10   standards and the highest level of patient care.  Indeed, the Rosewood Facility continues to

11   provide respected, Five-Star (as rated by CMS) care for its patients.

12           Despite this record of achievement, certain plaintiffs' counsel have targeted the Debtors

13   and have relentlessly pursued what they perceive to be potential "deep pockets" for recovery.

14   However, had the Debtors not filed for bankruptcy protection, and had plaintiffs with disputed

15   claims continued their unending litigation attacks against the Debtor, or obtained their threatened

16   judgments, the inevitable result would have been that the Debtors would have been forced to

17   close their businesses.  The Debtors, after substantial consideration of possible alternatives,

18   substantial efforts to settle disputes and litigation claims, and careful consideration of the effect of

19   the bankruptcy filings on their businesses, determined that the most prudent, proactive and

20   responsible course of action in order to protect their assets and the interests of their creditors, was

21   to file for bankruptcy protection.  The Debtors intend to work to reorganize their financial affairs

22   and resolve their litigation in a cohesive, organized manner, in a single forum.

23   ///

24
_____

25   [2]  Spencer Olsen and Verla Sorensen are the managers of Vermillion Investment Co. LLC (and
     Spencer Olsen is also the Chief Financial Officer and Treasurer of only CCI, and also an assistant

26   secretary and a Director of both CCI and NAHC).  Don Laws is the manager of Davey Jay LLC.
     John L. Sorensen is the Trustee of the Manager of Oakleaf Holding, LLC (and Mr. Sorensen is

27   also the President and Chief Executive Officer of NAHC, and the Chairman of the Board of
     Directors of CCI).  Additional information regarding the officers and directors of the Debtors will

28   be provided when the Debtors file their Schedules of Assets and Liabilities and Statements of
     Financial Affairs.

**B.**    <u>**Parties Asserting Secured Claims And Interests In The Debtors' Cash.**</u>

The following parties have filed UCC-1 financing statements against NAHC, some of which assert an interest in NAHC's cash, as follows:

1.    First Professional Bank N.A. ("<u>FPB</u>"):  FPB asserts a security interest in nearly all of NAHC's assets, including NAHC's cash.  NAHC does not concede that FPB has a security interest in NAHC's cash collateral.  As of the Petition Date, NAHC owed FPB the sum of $0.  FPB appears to be the predecessor to Pacific Western National Bank.

2.    American Express Business Finance Corporation ("<u>AMEX</u>"):  AMEX asserts a security interest in all of NAHC's assets, including accounts, in connection with what appears to be an equipment lease between AMEX and NAHC (NAHC does not take any position at this time whether the agreement is a true lease).  NAHC does not concede that AMEX has a security interest in NAHC's cash collateral.  As of the Petition Date, NAHC owed AMEX the sum of $3,496.24.

3.    Telerent Leasing Corporation ("<u>Telerent</u>"):  Telerent asserts a security interest in certain equipment.  It does not appear that Telerent asserts a security interest in NAHC's cash. As of the Petition Date, NAHC owed Telerent the sum of $0.

The following parties have filed UCC-1 financing statements against CCI, some of which assert an interest in CCI's cash, as follows:

1.    First Professional Bank N.A. (FPB):  FPB asserts a security interest in nearly all of CCI's assets, including CCI's cash.  CCI does not concede that FPB has a security interest in CCI's cash collateral.  As of the Petition Date, CCI owed FPB the sum of $0.  FPB appears to be the predecessor to Pacific Western National Bank.

2.    Pacific Western National Bank ("<u>PWB</u>"): PWB asserts a security interest in nearly all of CCI's assets, including CCI's cash.  CCI does not concede that PWB has a security interest in CCI's cash collateral.  As of the Petition Date, CCI owed PWB the sum of approximately $79,000, in connection with a business loan originally made to CCI in 4/7/12, in the original principal amount of $232,906.  CCI is current with all of its loan obligations to PWB.  CCI intends to remain current on its obligations to PWB during the course of these Chapter 11

bankruptcy cases.

3.    GreatAmerica Leasing Corporation ("GreatAmerica"): GreatAmerica asserts a security interest in certain equipment.  It does not appear that GreatAmerica asserts a security interest in CCI's cash. As of the Petition Date, CCI owed GreatAmerica the sum of $0.

Filed concurrently herewith is the Declaration of Krikor J. Meshefejian which attaches as Exhibits the above-referenced UCC-1 financing statements.

**C.    The Debtor's Assets.**

As of the Petition Date, NAHC had cash on hand of approximately $1,902,388 and CCI had cash on hand in the approximate amount of $1,023,049.   In total, the Debtors had cash on hand of approximately $2,925,437 as of the Petition Date.  NAHC's primary assets consist of its service agreements with the 36 facilities, including CCI, its cash on hand, its receivables in the amount of $1,297,629, its lease of real property located at 32836 Pacific Coast Highway, Dana Point, CA  92629, and fixed assets with a book value of approximately $222,495.

CCI's primary assets consist of its accounts receivable (owing by Medi-Cal, Medicare, and private pay patients), its lease of real property located at 6041 Fair Oaks, Blvd, Carmichael, CA  95608, the Rosewood Facility itself (i.e., CCI's business of operating a skilled nursing facility), and the personal property assets located at the Rosewood Facility.  As of the Petition Date, CCI had outstanding accounts receivable of approximately $1,944,387.

**The proposed operating budget for NAHC is attached as Exhibit 1 to the Omnibus Declaration of Spencer Olsen.**

**The proposed operating budget for CCI is attached as Exhibit 2 to the Omnibus Declaration of Spencer Olsen.**

As these budgets respectively show, in addition to the respective cash on hand as of the Petition Date and accounts receivable of the Debtors outstanding as of the Petition Date, NAHC expects to collect just during the remaining portion of February 2015 and the month of March 2015, the amount of approximately $4,100,000, and CCI expects to collect during that same period of time, the amount of approximately $2,000,292.

Based on the foregoing, the Debtors submit that their respective cash on hand and accounts receivable provide such claimants (to the extent that they have an interest in the Debtors' respective cash) with substantial equity cushions.  As a result, there cannot be any question that these claimants are adequately protected by an overwhelming equity cushion and cannot be harmed in any way by the Debtors' use of their respective cash collateral.

**D.    The Debtors' Unsecured Debt.**

Needless to say, the Debtors vehemently dispute the litigation claims asserted against them.  Other than litigation claims (which are disputed), NAHC has approximately $3,600,000 of unsecured trade debt and CCI has approximately $720,000 of unsecured trade debt.  CCI is also a guarantor of a loan to Rolling Hills Capital Reserves LLC (which shares some common ownership with CCI).

**E.    The Debtors' Proposed Use Of Cash Collateral.**

The Debtors require an immediate order of this Court authorizing these Debtors to use cash collateral in accordance with their respective budgets to enable these Debtors to (i) pay all of their normal and ordinary operating expenses (such as payroll, rent, utilities, insurance, and payments to vendors for, in the case of the Rosewood Facility, service fees to NAHC, patient food and medical supplies and services such as therapy and lab) as they come due in the ordinary course of their businesses; (ii) purchase new inventory in order for these Debtors to preserve the going concern value of their businesses, assets and reorganization efforts; and (iii)  avoid immediate and irreparable harm.

It is clear that the Debtors' businesses have significant going concern value and the cessation of the Debtors' business operations would place that going concern value in serious jeopardy, as well as cause the loss of the jobs of the Debtors' employees and displacement of and risk to the health and well-being of the current residents of the Rosewood Facility.

The Debtors therefore seek authority to use cash collateral on an interim emergency basis pending a final hearing in accordance with their budgets, except that these Debtors seek Court authority to exceed the total budgeted sums (on an aggregate basis with these Debtors having the ability to deviate on particular line items by more than 25% provided the aggregate deviation does

not exceed 25%) in any single month.  If actual expenditures for any line items are less than the budgets, the difference shall carryover to the following month.  The continued residency and care for all of the current patients of the Rosewood Facility and the continued employment of all of the Debtors' respective current employees are entirely dependent upon these Debtors' immediate use of cash collateral.  Given the devastating impact that a closure of these Debtors' businesses would have on employees, residents and creditors, and given the overwhelming value in these businesses, these Debtors submit that immediate use of cash collateral is clearly warranted and appropriate.

## II.    DISCUSSION

**A.    The Debtors Should Be Authorized To Use Cash Collateral To Operate, Maintain and Preserve Their Businesses.**

The Debtors' use of property of the estates is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A)    each entity that has an interest in such cash collateral consents; or

14

1    (B)    the court, after notice and a hearing, authorizes such use, sale or lease in

2    accordance with the provisions of this section.

3    See 11 U. S.C. §363(c)(2)(A) and (B).

4    It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for a

5    reasonable period of time for the purpose of maintaining and operating its property.  11 U.S.C. §

6    363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson*

7    *Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991).  In addition, where the debtor is operating

8    a business, it is extremely important that the access to cash collateral be allowed in order to

9    facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and

10    generally access to cash collateral is necessary to operate a business."  *In re Dynaco Corporation*,

11    162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459.

12    The Debtors are viable operating entities whose going concern value must be maintained

13    in order for these Debtors to maximize their value for all creditors and parties in interest, and for

14    these Debtors to successfully reorganize.  These Debtors can do so only with the continued use of

15    cash collateral.  The inability of these Debtors to continue to use cash collateral would cause the

16    decimation of these Debtors' significant going concern value, as well as the loss of jobs of

17    hundreds of employees and the displacement of over 100 facility residents.

18    **B.**    **The Potential Secured Creditors Are Clearly Adequately Protected By An**

19    **Overwhelming Equity Cushion.**

20    To the extent that an entity has a valid security interest in the revenues generated by

21    property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

22    Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

23    creditor's cash collateral if the secured creditor is adequately protected.  *In re Mellor*, 734 F.2d

24    1396, 1400 (9th Cir. 1984).  *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re*

25    *McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

26    Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood*

27    *Forest Associates*, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property

28    interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

15

Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.  *See also McCombs*, at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." *McCombs*, at 266.

The Ninth Circuit made clear in *Mellor, Id.* at 1401, that an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in cash collateral.  *See also In re McGowan, 6 B.R. 241, 243 (B.Ct.E.D.Pa.1980)* [holding a 10% cushion is sufficient to be adequate protection]; *In re Rogers Development Corp.*, 2 B.R. 679, 685 (B.Ct.E.D.Virg.1980) [court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property.]

Here, there can be <u>no question</u> that the potentially secured creditors are adequately protected.

Furthermore, in determining whether a secured creditor has equity in property, the Court should consider the "entire security package" not just a portion thereof.  *In re Opelika Manufacturing Corporation*, 66 B.R. 444, 447-48 (Bankr. N.D. Ill. 1986).

The law is also clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.  *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988).  *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982).  In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection.  The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business.  *See also In re McCombs, supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

Additionally, in determining adequate protection, Courts have stressed the importance of

16

1    promoting a debtor's reorganization.  In *In re O'Connor, supra*, the Tenth Circuit stated:

2    > In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to

3    > deal with cash collateral for the purpose of enhancing the prospects of

4    > reorganization.   This quest is the ultimate goal of Chapter 11.   Hence, the

5    > Debtor's efforts are not only to be encouraged, but also their efforts during the

6    > administration of the proceeding are to be measured in light of that quest.

7    > Because the ultimate benefit to be achieved by a successful reorganization inures

8    > to all the creditors of the estate, a fair opportunity must be given to the Debtors

9    > to achieve that end.  Thus, while interests of the secured creditor whose property

10   > rights are of concern to the court, the interests of all other creditors also have

11   > bearing upon the question of whether use of cash collateral shall be permitted

12   > during the early stages of administration.

13   808 F.2d at 1937.

14   Here, the Debtors' proposal to continue to operate their businesses should be approved by

15   this Court.  The Debtors' continued operations will not only preserve the value of their assets, but

16   will enhance their value.

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

### III. <u>CONCLUSION</u>

**WHEREFORE,** the Debtors respectfully request that this Court hold a hearing on this Motion, and enter an order substantially in the form attached as Exhibit "4" to the Declaration of Krikor J. Meshefejian:

(a)     authorizing these Debtors to use the cash collateral on an emergency interim basis pending a final hearing pursuant to the terms and conditions set forth in the Motion;

(b)     setting a final hearing to consider the Motion; and

(c)     granting such other and further relief as the Court deems just and proper.


Dated:  February 11, 2015             NORTH AMERICAN HEALTH CARE, INC.
                                      CARMICHAEL CARE, INC.

                             By:   */s/ Krikor J. Meshefejian*
                                      David L. Neale
                                      Krikor J. Meshefejian
                                      Levene, Neale, Bender, Yoo & Brill L.L.P.
                                      Proposed Attorneys for Debtors and Debtors
                                      in Possession