# FOR PUBLICATION

**FILED & ENTERED**

**FEB 05 2016**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte    DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>North American Health Care, Inc.,<br>    Debtor and Debtor in Possession.<br><br>In re:<br><br>Carmichael Care, Inc.,<br>    Debtor and Debtor in Possession.<br><br>☒ Affects All Debtors | Case No.: 8:15-bk-10610-MW<br><br>Jointly administered with:<br><br>Case No. 8:15-bk-10612-MW<br><br>Chapter 11 Cases<br><br>**MEMORANDUM DECISION AND ORDER ON DEBTORS' TORT CLAIM RESOLUTION PROPOSAL**<br><br>Date:     January 25, 2016<br>Time:    2:00 p.m.<br>Courtroom:  6C |

David L. Neale and Krikor J. Meshefejian, Levene Neale Bender Yoo & Brill LLP for North American Health Care, Inc. and Carmichael Care, Inc.

David M. Stern, Robert J. Pfister, and Kathryn T. Zwicker, Klee, Tuchin, Bogdanoff & Stern LLP for the Ad Hoc Group of Personal Injury Tort Claimants.

-1-

**WALLACE, J.**

Before the Court is Debtors' motion for an order approving and adopting Debtors' Tort Claim Resolution Proposal, Docket No. 264, filed June 12, 2015 (the "TCRP"). The TCRP provides for the mediation of each of the six[1] personal injury/wrongful death tort claims subject to the TCRP, followed by this Court's estimation of any claim unresolved through mediation. Should estimation be required, Debtors have asked the Court to estimate the claims individually for purposes of voting and distribution. For the reasons discussed below, the Court grants the motion in part and denies it in part.

### Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and General Order 13-05, filed July 1, 2013, of the United States District Court for the Central District of California. Venue is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B).

### Debtors' History and Business

Debtor Carmichael Care, Inc. ("CCI") operates Rosewood Post-Acute Rehabilitation, a skilled nursing facility located in Sacramento, California (the "Rosewood Facility"). The Rosewood Facility provides full-time care 24 hours per day/ 7 days per week to approximately 107 patients, employing for that purpose approximately 184 employees.

Debtor North American Health Care, Inc. ("NAHC") provides bookkeeping and accounting services, social media services, payroll services, insurance procurement services, information technology services, human resource services and other services to the Rosewood Facility pursuant to a Services Agreement between NAHC and CCI. NAHC, whose principal place of business is Dana Point, California, also provides essential services to 35 other facilities generally in the skilled nursing care line of

---

[1] Originally, seven tort claims were subject to the proposal. However, in view of the settlement of the Byrne claim through mediation the number is now down to six. Debtors' Response to Statement of the Ad Hoc Group of Personal Injury Tort Claimants Regarding the Debtors' Tort Claim Resolution Proposal, Docket No. 284, filed July 7, 2015 ("Debtors' Response") at 4 fn. 1.

business.

NAHC and CCI are brother-sister corporations owned by the same interests. NAHC is owned 44 percent by Vermillion Investment Co. LLC, 24 percent by Davey Jay LLC, 28 percent by Oakleaf Holding LLC, 2 percent by Shard Holding LLC and 2 percent by Jay Laws. CCI's ownership structure is identical to NAHC's ownership structure. A group of tort claimants subject to the TCRP has alleged that NAHC is owned, operated and controlled by members of two families – the Sorensens and the Lawses – with no outside investors, and that NAHC operates 36 nursing homes (including the Rosewood Facility) as part of a nursing home conglomerate. Debtors have not disputed these points.

The Debtors filed chapter 11 petitions on February 6, 2015. They allege that their bankruptcy filings were necessitated by what they describe as a "barrage" of tort claim lawsuits filed against them, sounding in elder abuse, wrongful death, infliction of mental distress and other causes of action. Debtors complain that despite the fact that they are providing "Five Star Care" to their patients, they have been targeted by plaintiffs' counsel and have been relentlessly pursued because they are perceived to be "deep pockets" for recovery. TCRP at 10. Debtors deny any liability with respect to these lawsuits.

The tort claim plaintiffs tell a different story. For example, in the Raymond K. Pierce case (included in the TCRP), the 61-year-old wheelchair-bound plaintiff alleges that he needed 24-hour care for physical injuries, altered speech difficulties, GI tube placement care and various other infirmities and that despite these obvious needs the Rosewood Facility engaged in "patient dumping" and secretly transferred him to "Maria's Board and Care," where he and one other patient were housed in an unheated, odorous garage that was contaminated with dog feces. According to Pierce's Third Amended Complaint, his GI tube quickly became infected because of the squalid and filthy living conditions, and he became septic and more gravely ill – and then was refused transport to a hospital. Finally, Pierce alleges that the Rosewood Facility well

knew that "Maria's Board and Care" was unlicensed and was housing elderly and disabled individuals in a garage because in the past it had dumped other patients at the same facility.

Debtors allege that despite their record of providing "Five Star Care" to patients, the litigation costs of dealing with these types of lawsuits are diverting "the Debtors' resources and focus away from operating their businesses." TCRP at 10. They "determined that the most prudent, proactive and responsible course of action in order to protect their assets and the interests of their creditors, was to file for bankruptcy protection." *Id.*

### Tort Claims Subject to the TCRP

Debtors propose that the following six tort claims be subject to their tort claim resolution proposal:  Goldman, Wilson, Chandler, Pierce, Howarth, and Kayle.  The first five actions are pending in Sacramento Superior Court; the last one is pending in the United States District Court for the Central District of California.  According to Debtors, Goldman and Chandler allege damages in excess of $10 million, Howarth in excess of $4 million and the others have not put the Debtors on notice as to the amount of damages being sought.  As mentioned earlier, the actions variously allege elder abuse, wrongful death, fraud, negligence, abuse of a dependent adult, infliction of emotional distress and violation of the patient's bill of rights.

Each of the six tort claimants filed a proof of claim in an unliquidated amount.

Five of the six tort claimants – Goldman, Wilson, Chandler, Pierce and Howarth – have constituted themselves into an Ad Hoc Group of Personal Injury Tort Claimants pursuant to Federal Rule of Bankruptcy Procedure 2019 (the "Ad Hoc Group").  Kayle, the sixth tort claimant, is represented by Girardi | Keese.

### Genesis of the TCRP

In view of the unliquidated nature of the six tort claims and their unknown magnitude, the Court became concerned that it would be difficult or impossible for the Debtors to propose or confirm a plan within any reasonable period of time.  The Court

also had before it evidence suggesting that it would take years to liquidate these claims if relief from stay were granted and the state and federal court actions by the tort claimants against the Debtors proceeded in their ordinary course. Consequently, the Court ordered the Debtors to propose a framework for resolving, or, failing that, at least quantifying the amount of, the tort claims. As Debtors correctly point out, "[t]he whole point of the proposal is to get an understanding of the actual magnitude of the Tort Claims to assist the Debtors in developing an exit strategy for these cases." Debtors' Response to the Ad Hoc Group's Supplemental Brief on the Debtors' Tort Claim Resolution Proposal, Docket No. 504, filed January 8, 2016 ("Debtors' Second Response") at 20.

### A Summary of the TCRP

As mentioned earlier, the TCRP provides for a two-step process. First, there is a mediation between the Debtors and each of the six tort claim plaintiffs. If mediation is successful, and the parties agree upon a settlement amount, Debtors would file a motion requesting approval of the settlement agreement pursuant to Federal Rule of Bankruptcy Procedure 9019. As a result of a subsequent clarification by Debtors, the settlement would be a fixed sum of money, not merely an allowed unsecured claim for a fixed amount of money. Various provisions of the TCRP address timing considerations, meet-and-confer, mediator selection and other nuts and bolts issues involving a mediation.

If mediation fails to result in a resolution of a tort claim, the TCRP proposes that the Court estimate the claim pursuant to 11 U.S.C. § 502(c) for purposes of voting and distribution (and, presumably, plan confirmation, although this is not specifically mentioned). The TCRP provides the following details regarding this process: (1) Within 10 days after the end of the Mediation Period as defined in the TCRP, tort claimants must file a statement with this Court indicating whether they consent to the entry of a final order by this Court estimating their claims for purposes of voting and distribution. If they do not consent, this Court would embody its determination of the estimation matter

in proposed findings of fact and conclusions of law and would submit the same to the United States District Court, which would then consider the matter and enter a final order.  (2) 30 days after the conclusion of the Mediation Period, the tort claim plaintiff files a brief with this Court in support of the claim together with written declarations and documents.  (3) 30 days after the submission of such briefs and evidence, Debtors would file their brief in opposition, coupled with declarations, documents and expert reports.  (4) 15 days after Debtors submit the aforementioned pleadings, the tort claim plaintiff may file a reply brief.  (5)  15 days after the reply is filed, or as soon as the Court's calendar would permit, the Court would hold a hearing, after which the Court would "estimate the monetary amount of the Tort Claim on a final basis" if the tort plaintiff consented to this Court's entry of a final order or would make requisite findings of fact and conclusions of law and submit them to the United States District Court.  Debtors estimate that the entire process would take about 180 days from the entry of the order approving the Tort Claim Resolution Proposal.  It is envisioned that the resolution of all the tort claims will run concurrently.

### The Court's Ruling on the Mediation Aspect of the TCRP

The Ad Hoc Group supported the Debtors' mediation proposals in the TCRP subject to two caveats relating to insurance information and an alleged incongruity between the parties' obligations to make pre-mediation settlement offers.  Each of those caveats has now been eliminated, and the Ad Hoc Group has consented to mediation. The Court has not heard the Kayle parties to object to mediation.  Consequently, the Court hereby grants that portion of the motion seeking approval and authorization of the mediation portion of the TCRP, with the one adjustment that the Mediation Period (as defined in the TCRP) will run for 120 days rather than 90 days following the date of entry of this Memorandum Decision and Order.

### The Mandatory Nature of Claim Estimation in This Case

The Court now turns to that portion of the TCRP seeking approval and authorization of Debtors' proposal relating to estimation of the tort claims that do not

settle through mediation. Debtors argue, and the Court agrees, that estimation is not simply optional in this case; it is required. Bankruptcy Code section 502(c) provides "[t]here shall be estimated for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." The statute's use of the words "there shall be" makes it clear that estimation of contingent or unliquidated claims is mandated and required if the claims are such that their fixing or liquidation would "unduly delay" the case's administration.

Whether a claim is "unliquidated" and subject to estimation does not depend on whether it sounds in contract or in tort but on whether it is capable of ready computation. *In re Audre, Inc.*, 216 B.R. 19, 30 (B.A.P. 9th Cir. 1997).

Here, the evidence shows that all six claims are unliquidated and that their liquidation would unduly delay the case's administration within the meaning of section 502(c). As to the unliquidated nature of the claims: all six of the proofs of claim on file expressly describe the claim as unliquidated (implying that the claim holders themselves cannot yet compute the amount to which they are entitled) and Debtors clearly agree that all six are unliquidated. As to whether the liquidation of these claims would "unduly delay" the case's administration: the Ad Hoc Group, comprised of five of the six tort claimants whose claims are covered by the TCRP (all except claimant Kayle), agreed in open court at the hearing on January 25, 2016 that it would not contest the proposition that such liquidation would unduly delay the case's administration within the meaning of 11 U.S.C. § 502(c). Claimant Kayle has not argued that liquidation of the Kayle claim would not unduly delay case administration. Evidence introduced by the Debtors shows that liquidation of all the tort claims subject to the TCRP is likely to take several years.

For these reasons, it is clear that the Court must estimate the six tort claims that remain within the TCRP.

**The Nature and Purposes of Claim Estimation by a Bankruptcy Court**

Estimation is a summary procedure whereby the Court <u>estimates</u> the value of a

claim.  A bankruptcy court need only reasonably estimate the probable value of a claim. Such an estimate necessarily implies no certainty and is not a finding or fixing of an exact amount; it is merely the court's best estimate for the purpose of permitting the case to go forward.  *Falk v. Falk (In re Falk)*, No. NC-12-1385-DJuPa, 2013 WL 5405564, at *7 (B.A.P. 9th Cir. Sept. 26, 2013).

This Court has wide discretion and latitude in estimating claims.  *In re Corey*, 892 F.2d 829, 834 (9th Cir. 1989); *In re Perry*, 425 B.R. 323, 342 (Bankr. S.D. Tex. 2010).  Importantly, the principal consideration in estimating unliquidated claims must be an accommodation to the underlying purposes of the Bankruptcy Code.  *Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Federal-Mogul Global, Inc.)*, 330 B.R. 133, 155 (D. Del. 2005).

Estimation can take various forms and can be made for different purposes.  Title 28 of the United States Code draws a critically important distinction between the estimation of an unliquidated claim for the purpose of confirming a plan (which includes estimating for voting because plan confirmation usually requires voting by creditors) and estimation for purposes of distribution.  The former is a core matter; the latter is noncore.  28 U.S.C. § 157(b)(2)(B).

Unliquidated claims can be estimated individually or in the aggregate.  *In re G-I Holdings, Inc.*, 323 B.R. 583, 622 (Bankr. D.N.J. 2005) (determining that unliquidated asbestos claims should be estimated in the aggregate).

### Selection of the Claim Estimation Mode in This Case

Estimation is by its very nature a second-best method of arriving at the amount of an unliquidated wrongful death/personal injury claim.  The best method is either a jury trial in a state court or a federal district court or a bankruptcy court determination of the claim amount under 11 U.S.C. § 502(b).  The comparison between estimating an unliquidated wrongful death/personal injury claim, on the one hand, and, on the other hand, determining the claim amount through a jury trial or a bankruptcy court's allowance procedure under section 502(b) can be likened, perhaps, to estimating the

number of marbles in a large glass jar as compared with taking the marbles out of the jar and counting them.  Even if the person who makes the estimation is skilled and experienced in estimating the number of marbles in a glass jar, the result of the estimation is likely to be less accurate (and certainly, under no circumstances, <u>more</u> accurate) than taking out the marbles one by one and counting them.

Although Congress has subordinated the goal of accuracy with respect to determining the value of unliquidated claims to the overarching goal of avoiding undue delay in a case's administration – because it has made such estimation mandatory under section 502(c) – Congress has not precisely defined the mode or method of claim estimation nor has it required a bankruptcy court to employ a particular mode or method of unliquidated claim estimation.  Instead, it has left the particular mode or method of claim estimation to a bankruptcy court's sound discretion (and the reported cases so hold).

Because estimation is a second-best method, the Court concludes that the scope of unliquidated claim estimation in this case should be confined to the extent necessary to accomplish the overarching goal of avoiding undue delay in this case's administration and not expanded beyond that point.  To phrase it differently, if the goal of avoiding undue delay can be achieved through a limited mode or form of claim estimation, a bankruptcy court ought not to expand the estimation's scope beyond this limited extent absent compelling reasons to do so.

Applying these principles in this case, the Court determines that the tort claims subject to the TCRP not settling through mediation and not otherwise resolved[2] should be estimated for purposes of voting and plan confirmation only, and not for purposes of distribution.  Moreover, the claims should be estimated in the aggregate and not individually, except that the Court leaves open the possibility that individual claim

---

[2] *See* discussion below under the heading "Tort Claimant's Election to Have the Bankruptcy Court Determine the Clam Amount for Purposes of Distribution."

estimation may be appropriate for voting purposes only.[3]

Debtors need an estimate of the aggregate amount of the unsettled, unliquidated tort claims so that they can craft a plan of reorganization calculated to satisfy the all-important plan feasibility requirement, but they do not need an estimate for plan confirmation purposes of the individual claim makeup of the aggregate amount.  If the aggregate estimate of the six claims is $120x, it is hard to see how Debtors' plan would be any different if the claims were five claims of $10x apiece and one claim of $70x than if each of the six claims were $20x apiece.  It is also hard to see how satisfaction of the plan feasibility requirement would be different under these two hypothetical scenarios.

The estimated aggregate amount will not be any kind of a cap on eventual distributions by the Debtors to the tort claimants.  The Court envisions that any order confirming a plan of reorganization will contain a provision whereby the tort claims that have not previously been resolved (through mediation or otherwise) are not discharged under 11 U.S.C. § 1141(d) but instead will be liquidated in amount through trials in state court or federal district court (or settled in such courts).

Estimation of the claims on an individual (as opposed to an aggregate) basis for purposes of distribution, proposed by Debtors in the TCRP, is problematic for a number of reasons.  It would slow down the reorganization process because the Court would be limited to issuing proposed findings of fact and conclusions of law to the District Court, thus necessitating two levels of judicial review which almost by definition would require more time to reach resolution than the estimation-in-the-aggregate process described above.  This runs directly counter to section 502(c)'s purpose of avoiding unnecessary delay in the case's administration.  Whether or not a jury trial would occur in state court or federal court following plan confirmation is difficult to predict because it will depend upon the chapter 11 plan's structure and provisions.  Debtors vigorously contend that they have no intention of capping tort claims under their plan through the use of the

---

[3] For the avoidance of doubt, the Court wishes to make it clear that it has not decided whether individual estimation for voting purposes only will or should be permitted.

estimation process.  Nevertheless, if the plan somehow made it uneconomic for a jury trial to go forward (although stopping short of outright elimination of the possibility of a jury trial through a section 1141(d) discharge), the tort claimants effectively would be deprived of their Seventh Amendment right to a jury trial, which this Court views as unfair, prejudicial and an outcome to be avoided.  Such an outcome would seem to be inconsistent with at least the spirit of 28 U.S.C. § 1411(a), that section providing as it does that "this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death claim."

      The Court's aggregate estimation of the tort claims for voting and plan confirmation purposes only is a core matter under 28 U.S.C. § 157(b)(2)(B).  The aggregate estimation motion will be heard and determined by this Court without a jury.  None of the parties has cited to the Court any authority holding that a creditor who files a proof of claim in a bankruptcy court is entitled to a jury trial with respect to the Court's estimation of such claim for voting and plan confirmation purposes, nor has the Court found any such authority.  Indeed, it would appear that when a party files a claim in a bankruptcy case, such party is deemed to submit to the bankruptcy court's equitable jurisdiction and loses any Seventh Amendment right to a jury trial in connection with the bankruptcy court's determination of the amount of such claim under 11 U.S.C. § 502(b). *Langenkamp v. Culp*, 498 U.S. 42, 44-45, 111 S. Ct. 330, 348 (1990).  If there is no Seventh Amendment right to a jury with respect to a <u>determination</u> of the claim, it follows *a fortiori* that there is no Seventh Amendment right to an <u>estimation</u> of such claim for purposes of voting and plan confirmation only.  It can be noted in this regard that since at least the eighteenth century disputed claims in bankruptcy cases were resolved by bankruptcy judges or their predecessors (i.e., referees and commissioners) without a jury. 2 WILLIAM BLACKSTONE, COMMENTARIES *480-81 (18th century practice whereby creditors proved their debts to the satisfaction of the bankruptcy commissioners appointed by the Lord Chancellor).

In reaching these determinations, the Court has considered the financial burden on Debtors of litigating the six tort claims in state or federal court (assuming for this purpose that none of the six settles through mediation or otherwise). Debtors have estimated that it would cost approximately $2.5 million to litigate all six claims. The Monthly Operating Reports ("MORs") from the inception of the case in early February 2015 through November 30, 2015 show that NAHC has 10-month profits of about $1.3 million and CCI has 10-month profits of about $1.1 million. Annualizing such profits and grossing them up for a three-year period of litigation, Debtors would have well over $7 million in profits to cover $2.5 million in costs. Additionally, the MORs show that Debtors' cash balances have increased by over $6 million in the 10-month period. Although an increase in a cash balance is certainly not equivalent to a profit, the large cash balance increase lends added confidence to the conclusion that the profits of NAHC and CCI for the 10-month period really are in the range of $2.4 million and are not some kind of accounting mirage. Consequently, it seems likely that Debtors will be able to fund the litigation costs as they come due.

The Debtors' plan will need to make some provision for the tort claims estimated in the aggregate by this Court. For purposes of illustration only, the Debtors' plan might create a sinking fund for the payment of judgments entered upon state or federal court jury verdicts with respect to the tort claim actions to the extent not covered by existing and applicable insurance, with provisions for depositing additional funds or withdrawing existing funds should such judgments exceed or fall short of the aggregate amount estimated by this Court. (The Court in no way requires a sinking fund; this is merely an example of how the claims might be dealt with under a plan).

For these reasons, the Court denies that portion of the TCRP motion asking this Court to estimate the tort claims individually for purposes of distribution but grants in a modified form that portion of the motion asking the Court to estimate the claims for purposes of voting – the modification being that the Court will estimate the claims in the aggregate (not individually) and for purposes of plan confirmation as well as voting.

**Tort Claimant's Election to Have the Bankruptcy Court Determine the Claim Amount for Purposes of Distribution**

It is true that aggregate estimation of the tort claims will make it impossible for the Debtors to immediately commence distributions to the tort claimants or for the tort claimants to receive such distributions. In order to avoid prejudice to the tort claimants, the Court will permit, but not require, a tort claimant whose claim did not settle through mediation to elect to have this Court determine the amount of his or her claim under 11 U.S.C. § 502(b) for all purposes, including but not limited to distribution, to the extent permitted by 11 U.S.C. § 157(b)(2)(B) and 11 U.S.C. § 157(b)(5). Such election shall be made no later than 10 days after the end of the Mediation Period (as defined in the TCRP and as extended by this Court from 90 days to 120 days, i.e., a total of 130 days from the date of entry of this Memorandum Decision and Order) by filing a pleading to that effect with the Court and by serving such pleading on the Debtors.

**Conclusion**

Based on the foregoing and in conclusion, the Court approves Debtors' Tort Claim Resolution Proposal in part and disapproves it in part. The Court approves the mediation component of the TCRP with the modification that the Mediation Period (as defined in the TCRP) shall run for 120 days following the date of entry of this Memorandum Decision and Order. The Court disapproves that portion of the TCRP that estimates the tort claims individually for purposes of distribution and instead modifies the purpose and procedure for estimating the tort claims subject to the TCRP that have not settled through mediation and with respect to which no timely tort claimant election has been made (the "Remaining Tort Claims") as follows: (1) The Remaining Tort Claims will be estimated in the aggregate for purposes of voting and plan confirmation only. (2) Within 60 days after the tort claimants' election period (10 days after the end of the Mediation Period), Debtors shall file a motion to estimate the Remaining Tort Claims in the aggregate. (3) The Ad Hoc Group shall have 60 days after Debtors filed their estimation motion to file an opposition thereto. (4) Debtors shall

have 15 days to file a reply.  (5)  15 days after expiration of the time for filing a reply, and as the Court's calendar would permit, a hearing shall be held on Debtors' estimation motion after which the Court will estimate the monetary amount of the Remaining Tort Claims in the aggregate.

    IT IS SO ORDERED.

###

Date: February 5, 2016

Mark S. Wallace
United States Bankruptcy Judge